**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA MALAYTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: |
| | ) | |
| THE CHICAGO SCHOOL | ) | |
| OF PROFESSIONAL | ) | |
| PSYCHOLOGY, d/b/a, | ) | |
| THE CHICAGO SCHOOL, | ) | |
| and LYNESSA RICO | ) | |
| | ) | |
| Defendants | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Maria Malayter ("Ms. Malayter"), by and through her attorney, Russell J. Heitz, and for her Complaint against the Defendants, The Chicago School of Professional Psychology, d/b/a, The Chicago School ("The Chicago School") and Lynessa Rico ("Ms. Rico"), states as follows:

## NATURE OF THE CASE

Ms. Malayter seeks redress for workplace discrimination on the basis of disability, a hostile work environment based upon her disability and retaliation all in violation of the Americans with Disabilities Act of 1990 ("ADA") (Counts I-III ); for workplace discrimination based upon her age in violation of the Age Discrimination in Employment Act ("ADEA") (Count IV); for violations of the Family and Medical Leave Act of 1993 ("FMLA") (Count V); for violations of the Equal Pay Act ("EPA") (Count VI); pendant State of Illinois claims based upon the discrimination allegations in the federal Counts above but in violation of the Illinois Human Rights Act ("IDHR")

1

(Count VII ); pendant State of Illinois claims based upon violations of the Illinois Wage Payment and Collection Act ("Wage Act") (Count VIII); pendant State of Illinois claim based upon Tortious Interference with Contract/Expectancy (Count IX).

**PARTIES**

1.      At all times relevant hereto, Ms. Malayter was a citizen of the United States of America residing in Kane County, Illinois.

2.      At all times relevant hereto and upon information and belief, The Chicago School was a corporation located in Cook County, Illinois.

3.      At all times relevant hereto and upon information and belief Ms. Rico was a resident of Cook County, Illinois.

**JURISDICTION AND VENUE**

4.      Jurisdiction of this Court is provided by 28 U.S.C § 1331.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this judicial district under 28 U.S.C.  § 1391(a) because Ms. Malayter resides in this district, The Chicago School, does business in this district, and all events giving rise to Ms. Malayter 's claims occurred within this district.

**ADMINISTRATIVE PROCEEDINGS**

6.      Ms. Malayter timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 17, 2023.

7.     Ms. Malayter's Charge of Discrimination was automatically timely cross-filed with the IDHR. (A copy of the Charge of Discrimination filed with the EEOC and cross-filed with the IDHR is attached hereto and made a part hereof as Group Exhibit "A").

8.     Ms. Malayter has filed her Complaint within 90 days of Ms. Malayter's receipt of the EEOC "Dismissal and Notice of Rights" with respect to the above charges. (A copy of the EEOC "Dismissal and Notice of Rights" received on September 24, 2024 is attached here to and made a part hereof as Group Exhibit "B").

## BACKGROUND FACTS ("FACTS")

9.     Ms. Malayter was a professor at the The Chicago School for over 10 years until she was discriminatorily fired from the job she loved on May 1, 2023.

10.     The Chicago School claims it is in the Psychology, Behavioral Science and Health Science education business.

11.     On August 5, 2021, Ms. Malayter entered into an agreement whereby she would remain employed at The Chicago School until August 14, 2025 and Ms. Rico was aware of this agreement. (A copy of the agreement is attached as Exhibit "C").

12.     For over 10 years, Ms. Malayter was a good performing professor who received many awards, professional accolades and student accolades.

13.     Ms. Malayter has set forth some of the painful, horrific and hostile treatment she received after Ms. Rico became her supervisor in the fall, 2022 that support her discrimination claims in her Charge of Discrimination attached hereto and made a part hereof as Exhibit A.

14.     In 2022, Ms. Malayter received the Ted Rubenstein Inspired Teaching Award, the "2021-2022 Faculty of the Year Service-Learning Award", two internal grants from the Faculty

Development and Promotion Committee, and one grant from the Vice President of Academic Affairs Office for Innovative International Faculty Development.

15.     In September, 2022, Ms. Malayter made The Chicago School aware of her disability, need for accommodation, and the reason why she required intermittent FMLA leave.

16.     Ms. Malayter's disabilities include traumatic brain injury, migraine headaches and post-traumatic stress disorder ("PTSD").

17.     Ms. Malayter's accommodation requests NOT approved included the following:

- Meetings and classrooms with natural light.

- Important Communication in writing (policy changes, adaptations, processes).

- Flexibility to attend medical appointments.

- Extension of deadlines for proofreading work and processing long emails.

- Attend medical appointments for healthy support of the conditions.

- Ability to work a flexible work schedule that allowed for ancillary medical treatments.

18.     On September 9, 2022, in a meeting with Ms. Rico, Ms. Malayter disclosed her full medical diagnosis and treatment needs

19.     On September 15, 2022, Ms. Anita Schroeder, HR Generalist, questions validity of Ms. Malayter's ADA Accommodation requests.

20.     In September 2022, Ms. Rico purposely insists the fluorescent lights are kept on during meetings in naturally lit classrooms contrary to Ms. Malayter's ADA accommodation requests for her to avoid fluorescent lights.

21.     In October 2022, Ms. Rico stated The Chicago School is not required to grant ADA Accommodations; she threatened that Ms. Malayter may be fired.

22.     On November 2, 2022 at a special breakfast event, Ms. Malayter was in conversation with Ms. Michele Nealon, one of the Directors and the President of The Chicago School, about medical conditions and shared with her about the serious medical condition she was undergoing.

23.     In November 2, 2022, walking back to the parking garage with Ms. Rico, after the breakfast, Ms. Rico mocked Ms. Malayter exclaiming, "Oh, I have such a migraine!"

24.     On November 14, 2022, in a meeting where Ms. Malayter's disabilities were being discussed, Ms. Rico shouted at the top of her lungs "Maria, you are a LIAR!".

25.     On November 28, 2022, Ms. Malayter was notified, without explanation, that only parts of her ADA accommodation request were approved and only until the end of the semester on December 4, 2022.

26.     On December 7, 2022, Ms. Malayter requested FMLA to Anita Schroeder (HR), Ms. Schroeder told her "No, Ms. Rico would have to approve the FMLA request. "

27.     On December 12, 2022, Ms. Rico provided a list of extra work tasks to be completed before leaving for break.

28.     In December 14, 2022, Ms. Malayter's doctors resubmitted a clarified ADA Accommodation request; this was ignored by Anita Schroeder in HR until mid-January

29.     On December 22, 2022, Ms. Malayter remains working through December while the other professors were dismissed for Break on December 6, 2022.

30.     From January – May 2023, Ms. Malayter's ADA 2nd Accommodation request was questioned and never approved.

31.     In January 2023, Ms. Rico claimed a group of students came to her office to complain about Ms. Malayter's performance which was a lie.

32.     In January 2023, Ms. Rico was probing professors for negative information about Ms. Malayter in efforts to gather data against her.

33.     On January 17, 2023, Ms. Rico intentionally edited Ms. Malayter's Faculty Workload Plan to change her job description and add more to her workload, including extensive curriculum development ultimately to train her replacements.

34.     In February 2023, At the doctoral residency, Ms. Rico purposefully mispronounces Ms. Malayter's name twice even after public correction; the students complain about the observed disrespect.

35.     On February 24, 2023, Ms. Malayter refiles for intermittent FMLA and her doctor's office faxed the medical documentation four times as there had been no response.

36.     On February 28, 2023, Ms. Rico and Ms. Schroeder met with Ms. Malayter to discuss performance and place Ms. Malayter on a PIP containing falsified data and they refuse to

discuss the inaccurate information in the PIP or answer any questions Ms. Malayter had about how to be successful meeting the PIP.

37.     On February 28, 2023, Ms. Schroeder demands Ms. Malayter to sign the PIP without review or understanding of the document.

38.     Despite the hostile and discriminatory treatment Ms. Malayter was receiving from The Chicago School, it did not significantly affect her teaching for the spring semester, 2023.

39.     In fact, the student mid-course evaluations for spring semester, 2023 contained many student compliments about Ms. Malayter as follows:

- Dr. Malayter's approach to teaching and adult learning has made the class interesting and thought provoking.  She is an amazing teacher/professor.

- Dr. Malayter handles the class and some extreme opinions in a nonjudgemental and professional manner, which contributes greatly to the feeling of a safe classroom space/learning environment.

- Had multiple courses with Dr. M. and the care, knowledge and genuine sincerity is welcoming.

- Dr. Malayter creates an inclusive environment that fostering practical and theoretical learning of the course material.  She is open to feedback on ways to make the class more engaging. Additionally, she is attentive to ensuring the class content is relevant.

- It is because of Dr. Malayter that I have remained in the program.  Dr. M. provides an experience in each classroom session.

- Thoroughly enjoy the professor! She is always thoughtful, and considerate, often asks for feedback to ensure learning, and has the students' best interest at heart. She consistently incorporates additional to-to-date peer reviewed articles beyond class reading and exposes us to different forms of teaching styles and software as a management or collaboration tool.
- Dr. Malayter has done an excellent job of facilitating class discussions.
- Dr. Malayter obviously puts a lot of thought and time into planning and she guides our class to organic interactions. Thanks Dr. Malayter!

40.   It is uncertain whether The Chicago School was in possession of these mid-course evaluation from spring semester 2023 before it placed Ms. Malayter on the PIP on February 28, 2023 that was to run through May 28, 2023.

41.   On March 1, 2023, Ms. Malayter files harassment charge with Ms. Anita Schroeder.

42.   On March 10, 2023, Ms. Malayter asks Dean Michael Crawford for assistance with approval for the new intermittent FMLA request and Mr. Crawford refers her back to HR and then states, "Never talk about your medical condition to him or at the university."

43.   During March 2023, in a meeting with Dean Michael Crawford and Ms. Rico, about adjunct faculty and student concerns, Dean Crawford threatened retaliation against Ms. Malayter stating she is likely to receive a harassment complaint.

44.   On March 31, 2023, Ms. Amy Tomlinson, Director of HR, recommended Ms. Malayter quit the university.

45.     During March 2023, Mr. George Hay, faculty member, refused to provide course materials and canvas shells to allow Ms. Malayter to complete her assigned work by the deadline.

46.     During April 2023, Ms. Malayter's self-report performance review was submitted and never completed by Ms. Rico

47.     On May 1, 2023, 28 days before the PIP was to expire and before receiving more positive student evaluations for the end of spring semester, 2023, The Chicago School terminated Ms. Malayter's employment.

48.     Many of the faculty were shocked at the firing of their esteemed colleague.

49.     One assistant professor attempted to get The Chicago School to reverse its decision to terminate Ms. Malayter's position by writing that Dr. Malayter has always been dedicated educator, who has consistently gone above and beyond to ensure that her students receive a high-quality education.

50.     This same assistant professor expressed concerns to The Chicago School about the PIP Ms. Malayter was placed on as follows: "I expressed concerns that not all the goals seem to be clearly measurable and questioned how progress and mastery would be objectively determined. I shared several ideas for how measurement plans could be implemented and systems that Maria could use to support with dissertation and advising processes. Additionally, the duration of the PIP was 90 days and set to end on 5/29/23, which may already be considered a brief amount of time to address multiple complex goals and implement new systems. However, Maria was terminated from her position on 5/1/23 and denied the full time period of her PIP to make improvements and meet her goals."

51.     Subsequent to May 1, 2023, Ms. Malayter was retaliated against in part by interfering with her COBRA benefits, refusing to reimburse her for work expenses and refusing to return personal items that would have helped Ms. Malayter find a new professor position.

**COUNT I**
**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. §1201 et seq.) (Hostile work environment based upon disability)**

1-51.   Ms. Malayter restates and realleges Paragraphs 1 through 51 of Facts above as Paragraphs 1 through 51 of this Count I.

52.     At all times relevant to this Complaint, The Chicago School was an "employer" and Ms. Malayter was an employee under the ADA.

53.     Ms. Malayter had a disability as defined by the ADA, at the time she was terminated from employment.

54.     Ms. Malayter's history of disability known to The Chicago School that constituted at "record of disability" as defined by the ADA.

55.     The facts set forth above also demonstrate The Chicago School regarded Ms. Malayter as disabled in violation of the ADA including 42U.S.C.§12112(a) and (b)(1).

**WHEREFORE,** Plaintiff Maria Malayter prays for judgement in her favor and against Defendant, The Chicago School as follows:

a.     Back pay, employment benefits, and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of her disability in violation of the ADA, as amended;

b.     Prejudgment interest at the prevailing rate on the award of back pay, lost

employment benefits and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of disability in violation of the ADA, as amended;

        c.      Restoration and make-whole relief for the loss of employment benefits Ms. Malayter suffered as a result The Chicago School's discriminating against her in violation of the ADA, as amended;

        d.      Reinstatement with seniority and any promotional opportunities Ms. Malayter would have had but for the discriminatory conduct;

        e.      Compensatory damages against The Chicago School because of the past and future physical and mental pain and distress and inconvenience caused by its discriminatory actions;

        f.      An Order declaring that Ms. Malayter's rights under the ADA, as amended were violated and any injunctive relief or other relief this Honorable Court may deem to be just and appropriate to prohibit further discrimination;

        g.      Reasonable attorneys' fees, expert witness fees and costs of this action and of prior administrative actions; and,

        h.      Post-judgment interest on any of the awards above together with any other relief this Honorable Court may deem to be just and appropriate.

## COUNT II
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### (29 U.S.C. §621 et seq.) (Failure to Accommodate Disability)

1-55.    Paragraphs 1 through 55, Ms. Malayter restates and realleges Paragraphs 1 through 55 above as Paragraphs 1 through 55 of this Count II.

56. The Chicago School failed to accommodate Ms. Malayter's disability by failing to provide the accommodations in ¶ 17 above.

57. Ms. Malayter would have been able to perform her job had she been reasonably accommodated without emotional pain and distress and inconvenience.

58. The Chicago School, through its agent, Ms. Rico, acted with malice and reckless indifference of Ms. Malayter's rights, in violating the ADA by refusing to accommodate Ms. Malayter's disability despite knowing that the ADA required such accommodations and it was readily apparent that Ms. Malayter needed reasonable accommodations.

59. The Chicago School's discriminatory conduct has caused and continues to cause Ms. Malayter to suffer substantial physical and mental/emotional distress and inconvenience.

**WHEREFORE,** Plaintiff Maria Malayter prays for judgement in her favor and against Defendant, The Chicago School as follows:

a. Back pay, employment benefits, and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of her disability in violation of the ADA, as amended;

b. Prejudgment interest at the prevailing rate on the award of back pay, lost employment benefits and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of disability in violation of the ADA, as amended;

c. Restoration and make-whole relief for the loss of employment benefits Ms. Malayter suffered as a result The Chicago School's discriminating against her in violation of the ADA, as amended;

d.      Reinstatement with seniority and any promotional opportunities Ms. Malayter would have had but for the discriminatory conduct;

e.      Compensatory damages against The Chicago School because of the past and future physical and mental pain and distress and inconvenience caused by its discriminatory actions;

f.      An Order declaring that Ms. Malayter's rights under the ADA, as amended were violated and any injunctive relief or other relief this Honorable Court may deem to be just and appropriate to prohibit further discrimination;

g.      Reasonable attorneys' fees, expert witness fees and costs of this action and of prior administrative actions; and,

h.      Post-judgment interest on any of the awards above together with any other relief this Honorable Court may deem to be just and appropriate.

## COUNT III
### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### (29 U.S.C. §621 et seq.) (Disparate Treatment on the Basis of Disability)

1-55    Paragraphs 1 through 55, Ms. Malayter restates and realleges Paragraphs 1 through 55 of Count I above as Paragraphs 1 through 55 of this Count III.

56.     The Chicago School intentionally, with malice and reckless indifference of Ms. Malayter's rights, violated the ADA by terminating her from employment despite knowing that such termination would violate the ADA.

57.     The Chicago School's discriminatory conduct has caused and continues to cause Ms. Malayter to suffer substantial physical and mental/emotional distress and inconvenience.

**WHEREFORE,** Plaintiff Maria Malayter prays for judgement in her favor and against Defendant, The Chicago School as follows:

a.      Back pay, employment benefits, and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of her disability in violation of the ADA, as amended;

b.      Prejudgment interest at the prevailing rate on the award of back pay, lost employment benefits and other compensation lost as a result of The Chicago School's discriminating against Ms. Malayter on the basis of disability in violation of the ADA, as amended;

c.      Restoration and make-whole relief for the loss of employment benefits Ms. Malayter suffered as a result The Chicago School's discriminating against her in violation of the ADA, as amended;

d.      Reinstatement with seniority and any promotional opportunities Ms. Malayter would have had but for the discriminatory conduct;

e.      Compensatory damages against The Chicago School because of the past and future physical and mental pain and distress and inconvenience caused by its discriminatory actions;

f.      An Order declaring that Ms. Malayter's rights under the ADA, as amended were violated and any injunctive relief or other relief this Honorable Court may deem to be just and appropriate to prohibit further discrimination;

g.      Reasonable attorneys' fees, expert witness fees and costs of this action and of prior administrative actions; and,

h.      Post-judgment interest on any of the awards above together with any other relief this Honorable Court may deem to be just and appropriate.

## COUNT IV
## VIOLATIONS OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
## (29 U.S.C. §621 et seq.)

1-51    Paragraphs 1 through 51, Ms. Malayter restates and realleges Paragraphs 1 through 51 of Facts above as Paragraphs 1 through 51 of this Count IV.

52.     Other significantly younger employees of The Chicago School did not receive the same treatment as Ms. Malayter.

53.     At all times relevant hereto, Ms. Malayter was an employee of The Chicago School and The Chicago School was Ms. Malayter's employer for purposes of the ADEA.

54.     The above conduct has proximately caused significant damage to Ms. Malayter, in violation of the ADEA.

**WHEREFORE,** Plaintiff Maria Malayter prays for judgement in her favor and against Defendant, The Chicago School as follows:

a.      Back pay, including all damages for lost or diminished employment benefits suffered because of the discriminatory practices of The Chicago School, through the date Judgment is entered;

b.      Awarding Ms. Malayter liquidated damages (or alternatively pre-judgment interest on back pay damages);

c.      Front pay (or alternatively reinstatement);

d.      Reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and,

e.      Ordering injunctive relief and other relief this Honorable Court may deem to be just and appropriate.

## COUNT V
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993

1-51    Paragraphs 1 through 51, Ms. Malayter restates and realleges Paragraphs 1 through 51 of Facts above as Paragraphs 1 through 51 of this Count V.

52.     At all times relevant to this Complaint, The Chicago School was an "employer" within the definition of §101(4)(A) of the Family and Medical Leave Act of 1993 [29 U.S.C. §2611(4)(A)].

53.     At all times relevant to this Complaint, Ms. Malayter was an "eligible employee" within the definition of §101(2) of the Family and Medical Leave Act of 1993 [29 U.S.C. §2611(2)].

54.     Based upon the facts set forth above, The Chicago School retaliated against Ms. Malayter and/or discriminated against her for her exercise of her rights under the Family and Medical Leave Act of 1993, in violation of the anti-interference and anti-discrimination provisions of §105(a) of the Family and Medical Leave Act of 1993 [29 U.S.C. §2615(a)], and/or the Department of Labor's anti-retaliation and anti-discrimination regulation [29 C.F.R.§825.220], and/or of the Department of Labor's fitness-for-duty regulation [29 C.F.R. §825.312].

55.     As a proximate result of this retaliation, Ms. Malayter suffered the damages alleged.

**WHEREFORE**, Plaintiff Maria Malayter prays for judgment in her favor and against The Chicago School as follows:

a.   Wages, employment benefits, educational benefits, and other compensation lost to her as a result of The Chicago School's interference and/or retaliation against her in violation of the Family and Medical Leave Act of 1993;

b.   Prejudgment interest at the prevailing rate from the date she was interfered and/or retaliated against to the date of judgment on the award of wages, employment benefits, and other compensation lost to him as a result of The Chicago School's interference and/or retaliation against her in violation of the Family and Medical Leave Act of 1993;

c.   Liquidated damages doubling the award of interest, wages, lost employment benefits, and other compensation lost to her as a result of The Chicago School's retaliation against her in violation of the Family and Medical Leave Act of 1993;

d.   Reasonable attorneys' fees and the costs and expenses of this action; and,

e.   Such other relief as this Court deems just.

## <u>COUNT VI</u>
## <u>VIOLATIONS OF THE EQUAL PAY ACT</u>

1-11   Paragraphs 1 through 11, Ms. Malayter restates and realleges Paragraphs 1 through 11 of Facts above as Paragraphs 1 through 11 of this Count VI.

12.   Dr. Malayter also asserts claims based upon violations of the Equal Pay Act.

13.     In discussions with Dr. Paul De Young, Dr. Malayter learned that they were comparable with similar number of years of college teaching and professional experience.

14.     Yet Dr. DeYoung was hired by The Chicago School at a $100,000 Associate Professor rank and Dr. Malayter was hired by The Chicago School at a $75,000 Assistant Professor rank.

15.     Dr. Malayter brought this discriminatory payment issue up with Anita Schroeder and Amy Tomlinson in HR and she was ignored and retaliated against.

16.     Dr. Malayter presented the unequal pay facts to Dr. Wendy Schiffman in Academic Affairs and she brushed Dr. Malayter off and simply said "oh yeah, we really need to fix our system for paying at the correct rank."

17.     Additionally, Dr. Hay was hired as an Associate Professor when he only had limited years of teaching.

18.     Dr. Hay was promoted to full Professor with less years of college teaching compared with Dr. Malayter.

19.     The aforementioned acts of The Chicago School constitute unlawful and willful discrimination against Ms. Malayter because of her gender, female, in violation of the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000(e), *et seq.*, and the Fair Labor Standards Act of 1938, Section 3, 29 U.S.C. Section 203, as amended by the Equal Pay Act of 1963.

**WHEREFORE,** the Plaintiff, Ms. Maria Malayter, demands judgment against the Defendants, The Chicago School as follows:

a. Back pay, prejudgment interest, bonuses, and damages for all employment benefits she would have received but for the discriminatory and retaliatory acts and practices of defendant; and

b. Awarding Plaintiff compensatory and punitive damages in an amount commensurate with the nature and enormity of the discriminatory acts committed; and

c. Awarding reasonable attorney's fees and costs incurred in this action; and

d. Ordering any other relief as this Court deems to be just and appropriate, including any remedies that are available under the Civil Rights act of 1991.

### COUNT VII
### VIOLATIONS OF ILLINOIS HUMAN RIGHTS ACT
### (775 ILCS 5/1-101 et. seq.)

1-51. Paragraphs 1 through 51, Ms. Malayter restates and realleges Paragraphs 1 through 51 of Facts above as Paragraphs 1 through 51 of this Count VII.

52. The facts alleged above supporting Ms. Malayter's federal discrimination claims are restated and realleged in this single Count sounding in a violation of the IHRA because the IHRA generally refers to how all types of employment discrimination affect the "terms, privileges or conditions of employment on the basis of unlawful discrimination….". See 775 ILCS 5/2-102(A).

53. The Chicago School is an "employer" in Illinois subject to the provisions of the IHRA.

54. Ms. Malayter was an Illinois "employee" as that term is defined by the IHRA.

55.     The IHRA Sections 1-103 and 2-102 prohibits discrimination in employment on the basis of disability and age.

56.     The actions of The Chicago School in intentionally engaging in and condoning harassment against Ms. Malayter and The Chicago School's discriminatory termination of her employment has proximately caused Ms. Malayter great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

**WHEREFORE**, the Plaintiff Maria Malayter prays for judgement in her favor and against Defendant, The Chicago School as follows:

a.      All wages and benefits Ms. Malayter would have received but for the discrimination, including pre-judgment interest;

b.      Compensatory damages in an amount to be determined at trial to compensate Ms. Malayter for the depression, humiliation, anguish, emotional distress, caused by The Chicago School's conduct;

c.      The Chicago School be required to pay prejudgment interest to Ms. Malayter on these damages;

d.      A permanent injunction enjoining The Chicago School from engaging in the discriminatory practices complained of herein;

e.      The court retain jurisdiction of this case until such time as it is assured that The Chicago School has remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

f.     An award of reasonable attorney's fees, costs, and litigation expenses; and;

g.     Such other relief as the court may deem just or equitable.

## COUNT VIII
## VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## (820 ILCS 115/1, *et seq.*) (THE CHICAGO SCHOOL AND MS. RICO)

1– 11 Paragraphs 1 through 11 of Facts above are restated and realleged as Paragraphs 1 through 11 of this Count VIII as if fully set forth herein.

12.    At all times relevant hereto, there was in effect in the State of Illinois a certain statute known as the Illinois Wage Payment and Collection Act (820 ILCS 115/1, *et seq*; hereinafter "Wage Act").

13.    The agreement described above between The Chicago School and Ms. Malayter to pay Ms. Malayter her employment compensation from May 1, 2023 through August 14, 2025 is covered by the Wage Act and such monies are construed as "wages" for purposes of the Wage Act.

14     Additionally, after being terminated from employment with The Chicago School, Ms. Malayter made repeated demands to be reimbursed for significant expenses that customarily are reimbursed and The Chicago School refused to pay these expenses; employee expenses are also considered employment compensation covered by the Wage Act and such monies are construed as "wages" for purposes of the Wage Act.

15.    At all times relevant hereto, Ms. Malayter was an employee of The Chicago School and The Chicago School was an employer for purposes of the Wage Act.

16.     At all times relevant hereto, Ms. Rico was an "employer" for purposes of the Wage Act and caused The Chicago School not to pay Ms. Malayter the wages due and owing to Ms. Malayter as set forth above.

17.     The Wage Act provides for interest on the unpaid monies due and owing to Ms. Malayter and Ms. Malayter's reasonable attorney fees in which The Chicago School and Ms. Rico are jointly and severally liable.

**WHEREFORE,** the Plaintiff, Maria Malayter prays that this Honorable Court enter judgment in his favor and against the Defendant, The Chicago School, and Ms. Rico, individually, jointly and severally, for all of her unpaid employment compensation in the amount in at least $336,000.00 and otherwise to be proven at trial, together with her court costs, unpaid interest at the rate of 5% per month on the wages found to be due and owing, and her reasonable attorney fees; furthermore, Maria Malayter prays for the penalty of 1% per calendar day after the unpaid wages are ordered to be paid by this Honorable Court and for such other relief as equity deems just and equitable.

## COUNT IX
## TORTIOUS INTERFERENCE WITH PROSPECTED ECONOMIC ADVANTAGE (MS. RICO)

1-51 Plaintiff realleges and incorporates paragraphs 1-51 of Facts above as though fully set forth herein as Paragraphs 1-51 of this Count IX.

52.     Ms. Malayter had a reasonable expectancy of continuing to be able to remain employed at The Chicago School given her employment agreement, stellar work history and positive student reviews.

53.     Ms. Rico knew of this expectancy.

54. The conduct of Ms. Rico above demonstrates that she intentionally interfered with Ms. Malayter's expectancy to continue to be employed at The Chicago School.

55. Ms. Rico had no reasonable justification for her interference with Ms. Malayter's employment at The Chicago School.

56. It was not in the interest of The Chicago School to terminate Ms. Malayter given her stellar work performance and reputation and The Chicago School would not have terminated Ms. Malayter's employment but for Ms. Rico's wrongful interference.

57. Upon information and belief, the firing of Ms. Malayter increased the likelihood of Ms. Rico receiving significantly more compensation.

58. The above-described conduct by The Chicago School, was willful and wonton, and with reckless disregard and indifference to the common law, public policy of Illinois, and to Ms. Malayter's rights thereunder and Ms. Rico should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

**WHEREFORE,** Plaintiff, Maria Malayter, prays for judgement in her favor and against Defendant, Lynessa Rico and requests that this court award to her all damages available under the law, including reinstatement, back pay with interest, future lost earnings, and make whole damages including non-economic compensatory damages sustained as a result of the wrongful conduct, with all damages in excess of $75,000 including litigation costs, court costs and punitive damages in excess an amount commensurate with the nature and enormity of the wrongs committed and for such other relief as this court deems appropriate and just.

Respectfully submitted,

Maria Malayter

By:     *s/Russell J. Heitz*_____
        Her attorney

        Russell J. Heitz
        Attorney at Law
        (ARDC No. 06201289)
        300 E 5th Ave., Suite 380
        Naperville, IL  60563
        630-355-1458
        rheitz@naperlawoffice.com

**JURY DEMAND**

Plaintiff, Maria Malayter, demands trial by jury as to all of her claims.

By     *s/Russell J. Heitz*_____
         Her attorney

Russell J. Heitz
Attorney at Law
(ARDC No. 06201289)
300 E 5th Ave., Suite 380
Naperville, IL  60563
630-355-1458
rheitz@naperlawoffice.com

EEOC REC'D 17 AUG 2023

| CHARGE OF DISCRIMINATION | AGENCY | | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | IDHR | 440-2023-09450 |
| | X | EEOC | |

| Illinois Department of Human Rights | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| **Dr. Maria Malayter** | **630-355-1458 x214 (Attorney phone)** |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| ~~Edinburgh Ln, Aurora, IL 60504~~ | | ~~REDACTED~~ |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME Michelle Nealon - President | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| **The Chicago School of Professional Psychology** | **500+** | **213-615-7200** |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| **325 N Wells Chicago, IL 60645** | | **Cook** |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| ~~REDACTED~~ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA / EPA)        LATEST (ALL) |
|---|---|
| [ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [X] AGE | May 1, 2023 |
| [X] RETALIATION  [ ] NATIONAL ORIGIN  [X] DISABILITY  [X] OTHER EPA | [ ] CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See attached Exhibit "A".

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 8/17/2023   X *[signature]* Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE (Day, month, and year) |

EEOC FORM 5 (Test 10/94)

**EXHIBIT**

tabbies®

A

EEOC REDACTED

# EEOC REC'D 17 AUG 2023

### EXHIBIT "A" TO CHARGE OF DISCRIMINATION

### MARIA MALAYTER VS. THE CHICAGO SCHOOL OF PROFESSIONAL PSYCHOLOGY

Ms. Maria Malayter ("Dr. Malayter") is a 55-year-old (DOB: ⬛⬛⬛⬛⬛) woman who was hired by The Chicago School of Professional Psychology ("The Chicago School") as a full time Assistant Professor in August 2015. When Dr. Malayter first joined The Chicago School, it was well known that Dr. Malayter possessed a traumatic brain injury, suffered from migraine headaches and post-traumatic stress disorder ("PTSD"). Dr. Malayter's disability did not interfere with her becoming and excelling as an Associate Professor as she consistently received Meets or Exceeds Expectations performance reviews and she was beloved by her students. In June, 2022 Dr. Malayter, as an Associate Professor, received an "Exceeds Expectations" annual performance review making her eligible for a significant merit pay increase. In July, 2022, Dr. Malayter was awarded the Ted Rubenstein Inspired Teaching Award.

In August, 2022 Dr. Malayter began reporting to a new supervisor by the name of Ms. Lynessa Rico ("Dr. Rico") who joined The Chicago School as an Associate Professor and Associate Chair of the Business Psychology Department on the Chicago campus.

Dr. Rico was made aware of Dr. Malayter's traumatic brain injury and that Dr. Malayter suffered migraines and PTSD. Unfortunately Dr. Malayter seemingly received nothing but hostility from Dr. Rico because of Dr. Malayter's disability. Over a period of months leading up to May 1, 2023, the date Dr. Malayter was told she was fired as an Associate Professor at The Chicago School, Dr. Rico was hostile to Dr. Malayter's disability in numerous ways including as follows:

- Delayed responding to Dr. Malayter's request for disability accommodation;
- Denied Dr. Malayter's disability accommodation requests;
- Made threatening and intimidating comments to Dr. Malayter relating to Dr. Malayter's disability;
- Exhibited distrust of Dr. Malayter's disability claim and other issues;
- Blamed Dr. Malayter for school issues that were not Dr. Malayter's fault;
- Openly yelled at Dr. Malayter in professional meetings;
- Harassed, mocked and belittled Dr. Malayter's disability;
- Changed Dr. Malayter's job requirements and responsibilities and reporting requirements that were in conflict with Dr. Malayter's accommodation requests which increased Dr. Malayter's work load and exacerbated the disability symptoms that Dr. Malayter was experiencing;
- Recruited Dr. Malayter's students to covertly do a SWOT (Strengths, Weaknesses, Opportunities, Threats) analysis on Dr. Malayter to uncover negatives related to Dr. Malayter's performance;
- Further retaliated against Dr. Malayter by putting her on a fabricated 90-day performance improvement plan (PIP) on February 28, 2023 and retaliatorily fired Dr. Malayter on May 1, 2023, 28 days before the PIP was to expire and despite Dr. Malayter receiving positive mid semester reviews from students;

1

EEOC REDACTED

# EEOC REC'D 17 AUG 2023

- Refused to pay Dr. Malayter wages that she had earned and reimburse her for work expenses incurred by Dr. Malayter.

According to Dr. Malayter's neuropsychologist, Dr. Lukasz Konopka, who signed Dr. Malayter's disability accommodation requests, the hostile actions of The Chicago School against Dr. Malayter were not only not helping the significant distress that Dr. Malayter was experiencing, but the actions were making Dr. Malayter's condition worse and actually were interfering with the therapeutic process.

On April 20, 2023 Dr. Malayter had a conversation with ███████████, a male associate professor in the business psychology department, at The Chicago School and he explained his Associate Professor rank, shared his years of experience and his salary information. Based upon that information, Dr. Malayter was able to conclude that she had been underpaid by approximately $25,000.00 per year at The Chicago School. Lastly, significantly younger employees of The Chicago School took over Dr. Malayter's duties and responsibilities after she was fired on May 1, 2023.

The May 1, 2023 firing has been devastating to Dr. Malayter. She anticipates that numerous students, colleagues, and grantors of numerous grants will attest to Dr. Malayter's good performance as an Associate Professor at The Chicago School. Dr. Malayter also anticipates that many of these students, colleagues, third parties and treating physicians will testify as to the mental, emotional and financial distress caused by The Chicago School's hostility to Dr. Malayter's disability and ultimate firing on May 1, 2023 and she is heartened by the outpouring of support. The above conduct of The Chicago School is in clear violation of the American's With Disabilities Act (42 U.S.C., §12101, et seq.), the Age discrimination in Employment Act (29 U.S.C., §621, et seq.), the Equal Pay Act of 1963 (29 U.S.C. 206(d)(1)) and the Illinois Human Rights Act (775 ILCS 5/1-101 et seq.).

Respectfully submitted,

Dr. Maria Malayter

EEOC REDACTED

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/24/2024

**To:** Maria Malayter
~~128 Edinburg~~
~~Aurora, IL 60504~~

Charge No: 440-2023-09450

EEOC Representative and email:     EVA BARAN
                                   Investigator
                                   eva.baran@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2023-09450.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
09/24/2024
_____
Amrith Kaur Aakre
District Director





# TheChicagoSchool®
## of Professional Psychology

08/05/2021

**Maria Malayter**



Dear **Maria Malayter**,

We are pleased to have you as a part of our community as we continue to fulfill the mission of The Chicago School of Professional Psychology, which states:

*Integrating theory, professional practice, and innovation, The Chicago School of Professional Psychology provides an excellent education for careers in psychology and related behavioral and health sciences. The school is committed to service and embraces the diverse communities of our society.*

This letter confirms your employment with The Chicago School of Professional Psychology under the following conditions:

**Employment Position.** Faculty is employed full-time as **Department Faculty** in the **IO/Business Psychology, Organizational Leadership, Behavioral Economics** Department with the rank of **Associate Professor**. Faculty teaching hours and additional duties are outlined in your individual Faculty Workload Plan for each academic year under this Agreement.

**Term of Agreement.** Subject to the termination provisions, this agreement shall begin 08/15/2021 and end 08/14/2025.

**Compensation.** Compensation shall be **$95,176.15** per academic year, paid biweekly, during the term of this Agreement. Any future changes to salary during the term of this Agreement shall be documented in Faculty's personnel file. This amount does not include any merit increases that may occur in the future, depending on performance.

**Benefits.** Upon commencement of employment, you will be eligible to participate in our benefits programs, subject to the terms and conditions of each benefit. You will be sent a Benefit Overview under separate cover, outlining what is available to you and your dependents. Benefits are effective on the 1st of the month following your date of hire. You will also receive 48 hours of sick time per calendar year.

**SupplementalAgreement.** See Attached

For further details regarding this agreement, its conditions and provisions, please reference the attached



**EXHIBIT**

tabbies®

C



Faculty Employment Agreement. If applicable, the policy regarding private practice at The Chicago School is also attached.

We know that you will make a tremendous contribution to The Chicago School of Professional Psychology during the term of this agreement. Please sign this letter and return it to me as proof of acceptance. If you have any questions regarding this agreement, benefits, or other employment matters, please do not hesitate to contact me.

APPROVED:

*Keith Carroll*
Keith Carroll (Aug 6, 2021 09:57 CDT)

**Department Chair**


*Stephanie De Cicco*

**Associate Campus Dean**


*Margaret A. Wartoze*

**Campus Dean**


*Theodore Scholz*
Theodore Scholz (Aug 10, 2021 07:18 CDT)

**Chief Academic Officer**


I hereby accept the appointment described under the terms and conditions set forth herein.



Accepted:

*Maria Malayter*
Maria Malayter (Aug 10, 2021 11:53 CDT)

**Maria Malayter**
{Page_Break_1}

# *Faculty Employment Agreement*

This Agreement made and entered into by and between The Chicago School of Professional Psychology ("The School") and faculty member ("Faculty").

**1. Employment.** The School hereby employs Faculty, and Faculty hereby accepts employment, in the position set forth in the Agreement Letter attached hereto and incorporated as if fully set forth herein.

**2. Term.** Subject to the provisions for termination as hereinafter provided, this Agreement, as may be amended from time to time, shall begin and terminate as set forth on the Agreement Letter.

**3. Faculty Duties.** Faculty agrees to undertake and perform, to the highest professional standards, certain duties and responsibilities that include, but are not limited to, the following:

**a.** Total number of teaching hours per academic year are assigned by the Department Chair or other authorized members of the Administration pursuant to the Faculty Workload Plan, which is incorporated by reference herein. Scheduling of teaching assignments is at The School's sole discretion;

**b.** Full time Faculty members must be on campus a minimum of 4 full days per week while school is in session. Part time Faculty members are required to be on campus a minimum of two full days while school is "in session". "In session" is defined as when classes are being taught for a particular program in addition to prep week (week before) and grading week (week after). All vacation and personal time is to be taken outside of the required time. The Department Chair must approve all other time off taken. In addition to, fulfilling teaching and advisory assignments, all Faculty members must attend Faculty Council, Department Faculty meetings, committee meetings, while school is in session. All Faculty members engage in scholarship and professional practice.

**c.** Providing service to The School community including, by way of example only, participation in admission and recruiting activities, service on committees, serving as a Faculty Advisor to students, and as Chairperson of, and reader on, dissertation and thesis committees;



**d.** Full time faculty assess student learning in accordance to The Chicago School of Professional Psychology practices and participate in academic program reviews as described in the Academic Program Review Handbook.

**e.** Adhering to all policies in the Faculty Supplement, as well as the Faculty and Staff Manual where applicable, and all other policies and practices which are presently in force at The School or changes adopted to either the Faculty Supplement or Faculty and Staff Manual from time to time;

**f.** If required, Faculty members must be licensed within two years post date of appointment, as appropriate for the assignment and location and;

**g.** Any other duties and responsibilities that may be assigned to Faculty by the Dean or his/her Department Chair.

**4. Compensation.** Compensation for the first year of this Agreement is set forth in the Agreement Letter. For any subsequent years, compensation shall be determined after Faculty's annual performance evaluation has been completed and will be effective on August 15. If the annual performance evaluation is not completed prior to the start of the succeeding academic year due to the Department Chair's inability to timely complete the performance evaluation, the increase in compensation, if any, shall be made retroactive to August 15.

**5. Benefits.** Faculty is entitled to specific benefits for which she/he is eligible as outlined in the current Full-Time or Part-Time Benefit Overview appropriate to the Faculty's appointment. The Benefit Overview is incorporated into this Agreement by reference and governs all benefits matters, including but not limited to disability coverage and leave of absence.

**6. Intellectual Property.** All matters relating to ownership or use of Intellectual Property are governed by The School's Intellectual Property Policy as reflected in the Faculty Supplement. By signing this Agreement each party acknowledges that they have reviewed and understand the terms of The School's Intellectual Property Policy and agree to abide by the terms of said Policy.

### 7. Administrative Duties.

It is possible that The School and Faculty may agree that Faculty assume certain administrative duties. To the extent Faculty assumes such administrative duties, such duties are specified in the Agreement Letter attached hereto and incorporated herein. Any such administrative duties assumed shall be treated as an at-will employment relationship, meaning that either Party may terminate the administrative relationship with or without notice, and with or without cause. Further, the administrative relationship is neither governed nor covered by the Faculty Supplement. If the administrative duties are removed, the Faculty Agreement remains in force and The School will provide an appropriate teaching load based on whether the contract is full-time, part-time or affiliate, provided appropriate classes are available, and compensation may be adjusted accordingly.



**8. Termination.** The School expressly reserves its full rights to terminate Faculty employment under the following conditions:

- for cause for such reasons as, by way of illustration only, one or more of the following: poor performance; unprofessional conduct or behavior; falsification of academic credentials; conviction of a felony; the commission of an act of fraud, moral turpitude or embezzlement; engaging in illegal drug use or substance abuse; or any other improper or illegal conduct as defined in the Faculty Supplement;
- the reduction in, phasing out, or discontinuation of institutional programs;
- for any material violation of the terms of this Agreement by Faculty; or
- in the event of "financial exigency". "Financial exigency" is defined as a financial situation requiring reduction of faculty as may be solely determined by The School Administration;
- low enrollment.

In the event of termination, written notice thereof shall be given to Faculty and shall be effective as of the date mailed or hand-delivered in accordance with this Agreement. Further, salary and benefits shall cease upon termination.

Faculty may terminate his/her employment by providing no less than one term's written notice to the Department Chair of such intent. The School may, at its discretion, require Faculty member to leave such employment prior to the end of such semester. In such an event, The School will retain Faculty member on its payroll at 50% of his/her last regular compensation rate and benefits premium through the end of the semester.

**9. Renewal of Agreement.** Faculty shall be evaluated annually by the Department Chair or other authorized member of the Administration. If The School decides not to offer a new agreement, Faculty shall be notified of same on or about the date specified in the then current Faculty Supplement.

**10. Notices.** All notices required or permitted to be given under this Agreement shall be given by certified mail, return receipt requested, to The School, c/o the Dean; and to Faculty at the address provided to Human Resources. Alternatively, notice may be hand-delivered by one party to the other and shall be effective upon delivery

**11. Entire Agreement.** This Agreement, any exhibits attached herein, and any policies incorporated into this Agreement by reference, including the Faculty Supplement and the Benefit Overview, sets forth and constitutes the entire Agreement and understanding and all of the representations and warranties of the Parties to the Agreement in respect of the subject matter of this Agreement, subject to the following: To the extent there may be differences between the terms set forth in this Agreement and those that appear in the Faculty Supplement and/or the Faculty and Staff Manual currently in force or hereafter adopted, the terms of this Agreement shall control. Where this Agreement is silent as to terms or conditions of employment, the Faculty Supplement and/or the Faculty and Staff Manual shall control.

**12. Modification or Amendment.** This Agreement may only be modified, amended or supplemented by



an agreement signed by the Parties affected by such modification, amendment or supplement.

**13. Governing Law.** This Agreement shall be construed, interpreted, enforced and governed by and under the laws of the state in which the employing campus is located. Exclusive jurisdiction and venue of any actions arising out of, or relating to or in any way connected with this Agreement shall be in the county and state in which the employing campus is located.

**14. Survival.** Following the expiration or termination of this Agreement, whether by its terms, operation of law, or otherwise, the terms and conditions set forth, as well as any term, provision, or condition required for the interpretation of this Agreement or necessary for the full observation and performance by each party hereto of all rights and obligations arising prior to the date of termination, shall survive such expiration or termination.

{Page_Break_2}

# *Private Practice Addendum*

The School recognizes that both The School and Faculty can benefit from permitting Faculty to engage in the private practice of psychology in which Faculty provides psychological services to private clients unaffiliated with The School on The School premises provided such private practice is performed responsibly and within certain guidelines.

This addendum to the Faculty Employment Agreement is to define the conditions under which Faculty may engage in the private practice of psychology during the term of employment with The School and upon the premises of The School.

**1. Standards for Private Practice.** Whenever engaging in the private practice of psychology upon the premises of The School ("Private Practice"), Faculty agrees to observe the laws of the jurisdiction of the TCSPP campus at which the Faculty engages in private practice, the Code of Ethics of the American Psychological Association, and all rules and policies of The School, as well as the rules and restrictions set forth herein. Faculty shall not engage in Private Practice except as expressly set forth herein.

**2. Scheduling and Time Limitations.** Faculty shall limit his or her participation in and schedule his or her Private Practice in a manner so that it does not interfere with his or her responsibilities as a faculty member of The School and does not interfere with or inhibit activities of The School. If, at any time, the Department Chair believes that Faculty's participation in Private Practice is interfering with or inhibiting his or her duties as a faculty member or The School's activities, Faculty agrees to adjust or limit his or her Private Practice activities as recommended by the Department Chair and/or to terminate the Private Practice.

**3. Liability Insurance.** Prior to engaging in Private Practice, Faculty shall obtain and maintain, at his or her own expense, and provide evidence of to Human Resources proof of both current professional



liability insurance coverage and general liability insurance coverage, with a certificate of insurance issued to The School, with The School as both the certificate holder and added as an additional insured (collectively, the "Insurance Coverage"). Faculty's professional liability insurance coverage shall have limits of liability of not less than $1,000,000.00 per person and $3,000,000.00 in the aggregate, and shall protect against the acts or omissions of Faculty in connection with Private Practice. Prior to engaging in Private Practice, Faculty shall submit to The School a Certificate of Insurance Coverage with The School as the Certificate Holder. The School must also be named as an Additional Insured and endorsement(s) must be provided. The School shall be entitled to notice from the insurer prior to any cancellation or nonrenewal of the Insurance Coverage. Notwithstanding the insurer's obligation to provide such notice, Faculty shall forward immediately to The School any notice of cancellation or nonrenewal of the Insurance Coverage that he or she receives from the insurer and shall provide immediate written notice of any actual cancellation or nonrenewal. In the event of nonrenewal or cancellation, Faculty shall not engage in Private Practice until a new certificate of insurance meeting all the requirements is provided to the **IO/Business Psychology, Organizational Leadership, Behavioral Economics** department. Faculty shall not refuse to submit a claim to his or her insurance carrier or fail to pursue insurance reimbursement in a manner that would reduce The School's indemnity rights under this Agreement.

**4. Use of School Resources.** Faculty may use his or her assigned faculty office (the "Faculty Office") at The School for the purposes of engaging in Private Practice consistent with the terms of this Agreement. Faculty shall not use any resources of The School other than their Faculty Office in furtherance of Private Practice, including, without limitation, administrative/clerical staff, office supplies, common areas, classrooms, e-mail, computer, or any other School resources. Faculty shall not use resources of The School to advertise his or her availability for Private Practice.

**5. Relationship of the Parties.**
- Faculty and The School acknowledge and agree that, to the extent Faculty engages in Private Practice, such activities are outside the scope of Faculty's employment with The School, and are performed solely on Faculty's own behalf and not as an agent, employee, or independent contractor of The School. Faculty acknowledges and agrees that he or she has no authority to bind The School, or to incur any obligations or expenses on behalf of The School in connection with Private Practice. Faculty shall not use The School's name, logo, telephone number, or address in connection with his or her Private Practice, and shall in no way represent or imply to any third party he or she is an agent of The School while engaged in Private Practice or that the Private Practice is a service offered by The School.
- Faculty and The School acknowledge and agree that Faculty's engagement in Private Practice is at his or her own risk, and that Faculty assumes all responsibility for any damages, liability, or injuries that may result from Faculty's engagement in Private Practice.
- Faculty and The School acknowledge and agree that, while Faculty is permitted to use the Faculty Office to engage in Private Practice consistent with this Agreement, The School has no duty or obligation to provide any benefit or support to Faculty's Private Practice, including, without limitation, any duty to maintain the Faculty Office or to ensure access to or condition of the Faculty Office or The School property.
- Faculty and The School acknowledge and agree that Faculty shall be solely and completely responsible for any and all taxes due and owing to any governmental entity or agency (local, state, and/ or federal) related to any fees or other income received by Faculty in connection with Private Practice.



**6. Security.** Faculty shall exercise due care for the safety and security of The School and its students, employees, independent contractors, and agents while engaging in Private Practice. Faculty shall monitor and be responsible for the actions of all Private Practice clients while on the premises of The School. Faculty shall not permit any person known to be violent or otherwise dangerous to access The School premises. Faculty shall not engage in Private Practice with clients who are undergoing counseling or mental health services in connection with their status as criminal offenders. Faculty acknowledges and agrees that he or she is responsible for any losses, damages, or liabilities arising from the presence of any person Faculty permits to enter upon The School premises in connection with his or her Private Practice.

**7. Client Acknowledgement.** Faculty agrees to require all Private Practice clients to sign a form provided by The School acknowledging, among other things, that the client's relationship is exclusively with Faculty and not The School, and that the Private Practice services are provided exclusively by Faculty and not by The School. Faculty shall maintain a file of signed client acknowledgement forms and shall provide a copy of any such form to The School upon request.

**8. Client Records.** All records relating to Faculty's Private Practice clients shall remain at all times the property of Faculty. Faculty shall designate an individual who will accept professional responsibility for such records in the event that the Faculty dies, becomes incapacitated or is terminated.

**9. Indemnification.** Faculty agrees to fully indemnify and hold harmless The School, and its officials, officers, employees, agents, and independent contractors, from any and all claims, costs, damages, demands, expenses (including, without limitation, attorneys' fees), judgments, losses or other liabilities of any kind or nature whatsoever arising from or directly or indirectly related to Faculty's Private Practice or Faculty's acts or omissions under this Agreement.

**10. Termination of Private Practice.** If The School determines, in its sole discretion, that Faculty has not complied with the terms of this Agreement regarding Private Practice or the Private Practice – Professional Service Policy, that any client of Faculty is a danger or nuisance to The School or its students, or that Faculty's Private Practice is interfering with or inhibiting the activities of The School or Faculty's performance of his or her duties as a faculty member of The School, The School may terminate Faculty's right to engage in Private Practice immediately by so notifying Faculty in writing.

Acknowledgement

I hereby accept the appointment described under the terms and conditions set forth herein.

Accepted: